**IN THE COURT OF APPEALS OF IOWA**

No. 24-1478
Filed December 4, 2024

**IN THE INTEREST OF A.D.,**
**Minor Child,**

**V.D., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, Judge.

A mother appeals the entry of a bridge order by the juvenile court granting the child's father sole legal custody and physical care. **AFFIRMED.**

Christopher J. Foster of Foster Law Office, Iowa City, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Mark J. Neary, Iowa City, attorney and guardian ad litem for minor child.

Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

This case presents a challenging question of whether the juvenile court had subject-matter jurisdiction over a child and her parents who no longer resided in Iowa when a bridge order was entered. The child was removed from her mother's custody and adjudicated a child in need of assistance (CINA) in April 2022. The child was subsequently placed in the custody of a "suitable other" (an employee of the daycare the child attended in Iowa) for nearly a year. After a dispositional hearing in March 2023, the juvenile court ordered the child to be placed in the custody of her father—a resident of Illinois at all times during this case.

After numerous permanency review hearings, the child was found to still be a CINA and ordered to remain in her father's custody in Illinois. Unexpectedly, the mother moved to Illinois to be closer to the child and father. During a permanency review hearing in February 2024, the juvenile court informed the parties it was contemplating entering a bridge order to close the CINA case. The juvenile court subsequently held a hearing to address the appropriateness of a bridge order. After the hearing, the juvenile court entered a bridge order granting the father sole legal custody and physical care.

The mother now appeals, arguing the juvenile court did not have subject-matter jurisdiction to enter the bridge order. After a de novo review of the record, we affirm.

I.      **Background Facts and Proceeding Facts**

The mother and father were in an on-and-off relationship for about a decade. When their relationship began, they both lived in Illinois. Of relevance to this appeal, their relationship produced a daughter—A.D.—born in 2020.

Sometime around or after the birth of A.D., the relationship between the mother and father ended, and the mother moved to Muscatine with A.D. The father remained in Illinois.

A.D. first came to the attention of the Iowa Department of Health and Human Services (HHS) in January 2022. A report was submitted to HHS alleging the mother's mental health was negatively impacting her ability to care for A.D. It was believed the mother was hearing voices and frequently hallucinating. HHS determined the report was founded and offered services to the mother. Two months later, the mother showed up at the daycare where A.D. was enrolled crying and indicating she was experiencing a mental-health crisis. She asked an employee of the daycare to care for A.D. for a few days while she addressed her mental health. Thankfully, a daycare employee was able to care for A.D. while the mother attempted to address her mental health. After a few days, the mother returned to resume care of A.D.

But a few weeks later, A.D. arrived at the daycare with a "urine soaked diaper" and "smelled strongly of urine." A daycare worker bathed A.D. and provided her with a change of clothes, at which point the worker noticed A.D. had deep bruising descending down both of her legs. Some of the bruising was close to A.D.'s genitals. The daycare then contacted HHS. An HHS employee and a detective from the Muscatine Police Department subsequently interviewed the mother. She claimed the bruising on A.D.'s legs was caused by slippers given to the child while she was in the care of one of the daycare employees. However, the slippers were observed by the HHS employee and detective, and they believed "there was nothing about the slippers" that could account for the bruising on A.D.'s

legs. During the interview, the mother also refused to have A.D. evaluated at the child protection center.

The State filed a CINA petition on April 22, 2022. That same day, HHS contacted the juvenile court to request an ex parte removal order. This request was granted by the juvenile court, and A.D. was placed in the care of a suitable other—K.O.—subject to HHS supervision.[1] K.O. was the employee of the daycare who cared for A.D. while the mother experienced a mental-health episode. A.D. was adjudicated a CINA on July 13, 2022, pursuant to Iowa Code section 232.96A(2), (3)(b), and (14) (2022). The juvenile court ordered the child to remain in the custody of K.O. subject to HHS supervision. The record discloses the mother frequently did not follow through with offered services or efforts to address her mental health. Additionally, the juvenile court directed HHS to conduct a home study with the father to determine if he was a viable placement option. In August, HHS filed a request for an Interstate Compact on the Placement of Children (ICPC) home study. The ICPC home study was completed in October.

A dispositional hearing was held in November, but a dispositional order was never entered by the juvenile court following this hearing. The ICPC report, recommending A.D. be placed with the father, was filed with the juvenile court in early March 2023. After the ICPC report was filed, A.D.'s GAL filed a motion to reopen the record requesting another dispositional hearing be held to consider placement options. This motion was granted, and the juvenile court held a dispositional hearing on March 20, 2023. Following this hearing, a dispositional

---

[1] On April 22, 2022, Mark Neary was appointed as the Guardian Ad Litem (GAL) and attorney for A.D.

order was entered ordering A.D. to be placed in the father's custody subject to HHS supervision.

Shortly after the March hearing, the mother unexpectedly moved to Decatur, Illinois. She did not inform HHS of her move. According to the mother, she moved to Illinois to be closer to A.D. and the father. A permanency review hearing was held in April. During this hearing, the mother testified that she had secured employment at a rehabilitation center and intended to remain in Illinois indefinitely. Although the father did not testify during this hearing, he did participate and indicated to the juvenile court he wished to litigate A.D.'s custody in Illinois. He represented to the juvenile court that he had an attorney ready to assist him in filing a custody action in Illinois. After the hearing, the juvenile court determined A.D. was still in need of assistance and ordered her to remain in the father's custody. The juvenile court also entered an order granting concurrent jurisdiction "so the parties may litigate custody in Iowa or Illinois."

Although the juvenile court entered an order granting concurrent jurisdiction to permit the parties to litigate A.D.'s custody in Iowa or Illinois, a custody action was never filed in either jurisdiction. The record discloses this was likely due to the fact the father lacked sufficient funds to retain an attorney to help him pursue a custody action in Illinois. Thus, the CINA case remained open. Several more permanency review hearings were held. Each hearing resulted in A.D. being found in need of assistance and continuing her placement in the father's custody in Illinois.

However, at a permanency review hearing held on February 29, 2024, the juvenile court indicated it wanted to enter a bridge order to close the case because

it was "not too excited about treading water either for another year or eighteen months or longer until there is finally custody order in Illinois." All parties, except the mother, agreed that a bridge order was a potential option for closing the case. A contested bridge order hearing was then set for May 23, 2024.

At the bridge order hearing, the juvenile court indicated its belief it had jurisdiction to enter a bridge order. The juvenile court stated, "I do think the Court has jurisdiction to enter the order even though the parties all reside now in Illinois and this case originated in Iowa." Following the hearing, the juvenile court entered a bridge order transferring jurisdiction over the custody, physical care, and visitation of A.D. to the district court. In its order, the juvenile court found the general requirements for a bridge order had been established, A.D. was no longer in need of the "supervision, care, or treatment to be afforded" by the court, and the case could close following the transfer of jurisdiction. The juvenile court's bridge order granted the father sole legal custody and physical care of A.D. The mother was granted visitation, but at the father's sole discretion regarding when such visits would occur, the frequency of visits, and the duration of visits.

The mother appeals, arguing the juvenile court lacked subject-matter jurisdiction to enter the bridge order.

## II. Standard of Review

We review jurisdictional issues invoking the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA) de novo. *In re J.M.*, 832 N.W.2d 713, 719 (Iowa Ct. App. 2013). Whether the statutory requirements of the UCCJEA have been met implicates a court's subject-matter jurisdiction. *Id.* A challenge to a

court's subject-matter jurisdiction may be brought at any time.  *In re Marriage of Engler*, 532 N.W.2d 747, 749 (Iowa 1995).

**III.    Analysis**

**A. Was Juvenile Court Required to Ensure the District Court Had Jurisdiction to Enter an Initial Child Custody Order?**

The mother's first argument on appeal is straightforward.  She argues the juvenile court can only transfer jurisdiction over a child "through a bridge order if the district court has jurisdiction to enter an initial child custody order."  We reject this argument for two reasons.

First, the statute authorizing the juvenile court to transfer its jurisdiction over the child's custody, physical care, and visitation to the district court via a bridge order does not require the district court to have subject-matter jurisdiction to enter an initial child-custody order.  The relevant statute provides the juvenile court may close a CINA case by transferring jurisdiction over such matters to the district court via a bridge order if:

> a.   The child has been adjudicated a child in need of assistance in an active juvenile court case, and a dispositional order in that case is in place.
> b.   Paternity of the child has been legally established by one of the methods enumerated in section 252A.3, subsection 10, or by operation of law due to the established father's marriage to the mother at the time of conception, birth, or at any time during the period between conception and birth of the child.
> c.   The child is safely placed by the juvenile court with a parent.
> d.   There is not a current district court order for custody in place.
> e.   The juvenile court has determined that the child in need of assistance case can safely close once orders for custody, physical care, and visitation are entered by the district court.
> f.   A parent qualified for a court-appointed attorney in the juvenile court case.

Iowa Code § 232.103A(1)(a)–(f). The mother does not contest that these requirements were met. Instead, she attempts to add an additional requirement not contemplated by the statute—that a transfer of jurisdiction to the district court through a bridge order can only occur if the district court has subject-matter jurisdiction to enter an initial child-custody order. But when a statute is clear and unambiguous, we must give effect to its express terms. *See In re Det. Of Geltz*, 840 N.W.2d 273, 276 (Iowa 2013) ("When a statute is plain and its meaning clear, courts are not permitted to search for meaning beyond its express terms." (citation omitted)). Further, we are not at liberty to add requirements to a statute. *See Iowa Dep't Transp. v. Soward*, 650 N.W.2d 569, 571 (Iowa 2002) (noting courts are "bound by what the legislature said, not by what it should or might have said").

Second, we believe the mother's argument ignores the fact that the initial child-custody determination in this case—for purposes of the UCCJEA—occurred during the CINA proceeding. *See In re R.S.*, No. 15-1112, 2015 WL 5577597, at *3 (Iowa Ct. App. Sep. 23, 2015) (finding an initial child-custody determination occurred when the children were adjudicated in need of assistance); *see also* Iowa Code § 598B.102(8) (defining an initial child-custody determination as "the first child-custody determination concerning a particular child").

Thus, the district court does not make an initial child-custody determination upon transfer of the case via a bridge order. Instead, it merely carries out the orders of the juvenile court provided in the bridge order and then enters a permanent custody decree consistent with the custodial arrangement contemplated by the bridge order. Although the entry of a bridge order creates a new "proceeding" on the district court's civil docket, it is in reality a continuation of

the underlying CINA case for purposes of closing the CINA case. Therefore, the district court is not making an "initial child-custody" determination upon entry of a bridge order. It is simply giving effect to the initial child-custody determination the juvenile court already made. And as we explain below, the juvenile court had subject-matter jurisdiction to enter a bridge order.

Accordingly, we find the juvenile court was not required to ensure the district court had subject jurisdiction before transferring its jurisdiction over A.D. to the district court.[2]

**B. Did the Juvenile Court Continue to Have Subject Jurisdiction?**

Moving on to the mother's second and final argument, she asserts the juvenile court lacked subject-matter jurisdiction to enter the bridge order. She contends the juvenile court lacked subject-matter jurisdiction because it lacked continuing jurisdiction under the UCCJEA. She believes the juvenile court lacked continuing jurisdiction under the UCCJEA because neither A.D. nor her parents resided in Iowa at the time the bridge order was entered. We disagree.

---

[2] The mother's argument misses the mark for another reason as well. We find the transfer of "jurisdiction" that occurs pursuant to Iowa Code section 232.103A(1) refers to a court's authority, not subject-matter jurisdiction. In *State v. Emery*, our supreme court interpreted Iowa Code section 232.45—which similarly provides a mechanism for the juvenile court to transfer "jurisdiction" over a juvenile delinquent to the district court—to refer to the juvenile court's *authority* to hear a case. 636 N.W.2d 116, 123 (Iowa 2001). The court in *Emery* reasoned that the legislature often is referencing a court's authority when it uses the term "jurisdiction" in a statute because the district court's subject-matter jurisdiction is set by our state's constitution. *Id.* at 122. Thus, we believe section 232.103A(1) is concerned with the transfer of the juvenile court's authority, not subject-matter jurisdiction. It would be odd indeed to add a subject-matter jurisdiction requirement to a statute that addresses a court's authority.

We need not to engage in lengthy analysis of whether the juvenile court had subject-matter jurisdiction to enter the bridge order under the UCCJEA. This is because A.D. was placed the father's custody in Illinois pursuant to the ICPC. Iowa Code section 232.158 governs children placed pursuant to the ICPC and provides:

> The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment, and disposition of the child which it would have had if the child remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state.

Iowa Code § 232.158(5)(a). We have previously interpreted this provision to mean the juvenile court retains subject-matter jurisdiction over a child even if the child and all other relevant parties move out of the state. *See R.S.*, 2015 WL 5577597, at \*3 ("This provision permits a juvenile court to place children with out-of-state relatives and retain its jurisdiction even if all parties move out of the state."). We have also interpreted this provision to override the UCCJEA in situations where Iowa may no longer be the "home state" of the child under the UCCJEA.[3] *See id.* at \*4 ("Even if the children now have a different home state pursuant to the UCCJEA, we determine the Iowa court, by placing the children pursuant to the ICPC, has retained jurisdiction.").[4]

---

[3] "Home state" under the UCCJEA is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." Iowa Code § 598B.102(7).

[4] We believe this same logic also gave the district court subject-matter jurisdiction over A.D. The ICPC was created to resolve interstate jurisdictional conflicts and to extend a state's jurisdictional reach over a child into the borders of another state for the purpose of investigating a proposed placement and supervising an out-of-state placement once it has been made. *See generally* Bernadette W. Hartfield,

Consequently, we find the juvenile court retained subject-matter jurisdiction to enter a bridge order in this case.

**IV.      Conclusion**

In sum, we affirm the juvenile court's bridge order, finding (1) the district court was not required to have subject-matter jurisdiction prior to the entry of a bridge order by the juvenile court; and (2) the juvenile court retained subject-matter jurisdiction over the child to enter the bridge order.

**AFFIRMED.**

---

*The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 Neb. L. Rev. 292 (1989).